# United States Court of Appeals for the Federal Circuit

05-1514

MEDLIN CONSTRUCTION GROUP, LTD.,

Appellant,

v.

Francis J. Harvey, SECRETARY OF THE ARMY,

Appellee.

Johnathan M. Bailey, Bailey & Bailey, P.C., of San Antonio, Texas, for appellant.

Dawn S. Conrad, Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, for appellee. With her on the brief were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, and Deborah A. Bynum, Assistant Director. Of counsel on the brief was Lloyd R. Crosswhite, Attorney, United States Army Corps of Engineers, of Fort Worth, Texas.

Appealed from: Armed Services Board of Contract Appeals

Administrative Judge Rollin A. Van Broekhoven

# United States Court of Appeals for the Federal Circuit

05-1514

MEDLIN CONSTRUCTION GROUP, LTD.,

Appellant,

v.

Francis J. Harvey, SECRETARY OF THE ARMY,

Appellee.

_____

DECIDED:  June 1, 2006

_____

Before LINN, DYK, and PROST, Circuit Judges.

PROST, Circuit Judge.

Medlin Construction Group, Ltd. ("Medlin") appeals from the summary judgment decision of the Armed Services Board of Contract Appeals (the "Board"), Medlin Constr. Group, Ltd., A.S.B.C.A. No. 54,772, 05-1 BCA ¶ 32,939, which held that Medlin is not entitled to recover certain increased costs incurred in performing Contract No. DACA63-02-C-0015 (the "Contract") with the Army.  Because we find that Medlin's interpretation is the only reasonable interpretation that gives meaning to all of the Contract provisions, we reverse and remand.

## I. BACKGROUND

On July 29, 2002, the government awarded the Contract to Medlin for the construction of the vehicle maintenance facility at Fort Hood, Texas, at the fixed price of $14,267,011.06. The Contract specifications describe the products to be used in performing this section of the Contract. Paragraph 2.2, "FIBER VOID RETAINERS," provides as follows:

> 2.2    FIBER VOID RETAINERS
>
> 2.2.1   Polystyrene Rigid Insulation
>
> Polystyrene rigid insulation shall conform to ASTM C 578, Type V, VI, or VII, square edged. Size shall be 38 mm thick by 400 mm in height by 1 meter in length, unless otherwise indicated.
>
> 2.2.2   Precast Concrete
>
> Precast concrete units shall have a compressive strength of no less than 17 MPa, reinforced with 150 mm by 150 mm by W1.4 WWF wire mesh, and 300 mm (height) by 1 m (length) by 40 mm (thickness) in size unless indicated.

Fort Hood Contract No. DACA63-02-C-0015, Specification Section 03100A, Paragraph 2.2. There is no dispute between the parties that paragraph 2.2 permits the contractor to choose between two materials for fiber void retainers: polystyrene rigid insulation ("polystyrene retainer") or precast concrete ("concrete retainer"). Part 3.1.3 describes the installation of the Fiber Void Retainers, and provides that "[f]iber void retainers shall be installed, continuously, on both sides of fiber voids placed under grade beams in order to retain the cavity after the fiber voids biodegrade."

Contract Drawing Sequence No. A-3101 states at "FOUNDATION NOTES: (SLAB - ON - GRADE)," note 11, that "ALL GRADE BEAMS SUPPORTED BY DRILLED PIERS SHALL HAVE VOIDS UNDER THEM. (SEE 'TYP. GRADE BEAM

05-1514                                        2

VOID' DETAIL THIS SHEET.)" The "TYPICAL GRADE BEAM VOID DETAIL" shows an arrow pointing to the retainer and states "41 x 304 x 914 mm PRECAST CONC. CONT. RETAINERS." The detail also provides that the "BOTTOM OF GRADE BEAMS SHALL BE FORMED w/ PLYWOOD OF SUFFICIENT THICKNESS TO SUPPORT WET CONCRETE DURING PLACEMENT (TYP. ALL BEAMS)" and that "51 x 152mm PRECAST CONC. SPACERS @ 914mm O.C." should be used at the joints of the side retainers.

The Contract contains the standard clauses for construction contracts, including FAR 52.236-21 SPECIFICATIONS AND DRAWINGS FOR CONSTRUCTION (FEB 1997) which provides:

> (a) The Contractor shall keep on the work site a copy of the drawings and specifications and shall at all times give the Contracting Officer access thereto. <u>Anything mentioned in the specifications and not shown on the drawings, or shown on the drawings and not mentioned in the specifications, shall be of like effect as if shown or mentioned in both. In case of difference [sic] between drawings and specifications, the specifications shall govern</u>. . . ."

> (b) Wherever in the specifications or upon the drawings the words "directed", "required", "ordered", "designated", "prescribed", or words of like import are used, it shall be understood that the "direction", "requirement", "order", "designation", or "prescription", of the Contracting Officer is intended . . . .

> (c) Where "as shown," "as indicated", "as detailed", or words of similar import are used, it shall be understood that the reference is made to the drawings accompanying this contract unless stated otherwise. The word "provided" as used herein shall be understood to mean "provide complete in place," that is "furnished and installed."

Fort Hood Contract No. DACA63-02-C-0015 at 00700-67 (emphasis added).

By letter dated January 27, 2003, Medlin wrote to the Central Texas Office of the Army Corps of Engineers stating that Medlin was informed at informal discussions with

Army representatives that the government believes the contract requires Medlin to install "precast concrete continuous retainers at <u>all</u> grade beams." Letter from Jerry Hallmark, Project Manager, to Tom Hamilton, US Army Corps of Eng'rs., Cent. Tex. Office (Jan. 27, 2003) (emphasis added). Medlin then stated its understanding of the Contract: that the specifications provide two options regarding the type of retainers that can be used, namely, polystyrene or concrete retainers, and that the contractor can choose between either of the two types. <u>Id.</u> Medlin also stated that it calculated its bid for the Contract based on the less expensive polystyrene material and the cost savings were reflected in its bid. <u>Id.</u>

In a subsequent letter, Medlin sent a sketch of "the construction of space beneath grade beams and utilization of specified <u>polystyrene rigid insulation</u>" and provided information on the polystyrene retainers Medlin proposed to use. Letter from Jerry Hallmark, Project Manager, to Tom Hamilton, US Army Corp of Eng'rs., Cent. Tex. Office (Jan. 31, 2003) (emphasis added).

The government responded by letter dated March 17, 2003, in which it stated that there is "no conflict between the drawings and the specifications" because "the specifications list[] two acceptable products and [the] drawings authoriz[e] the use of only one of the acceptable products[,] . . . pre-cast concrete retainers . . . ." Letter from Michael C. Bormann, Administrative Contracting Officer, to Medlin Construction Group, Ltd. (Mar. 17, 2003).

Medlin subsequently filed a claim with the Board in the amount of $56,140.38[1] for the extra costs associated with furnishing precast concrete fiber void retainers, as opposed to polystyrene retainers.

The issues, as framed by the Board, are "whether there is a conflict between the specification and drawing detail, and if so, . . . [whether] that conflict [can] be resolved by the normal rules of contract interpretation and the application of the SPECIFICATIONS AND DRAWINGS FOR CONSTRUCTION clause." Before the Board, both the government and Medlin argued that the specification and drawing detail were not in conflict, albeit for different reasons. The government argued there was no conflict because although the specifications allowed some "latitude or option to the contractor, the . . . drawings narrow the latitude or options by providing additional details regarding the grade beam void retainers." Narrowing the options available, according to the government, did not present a conflict. Medlin argued that the specifications and drawings were not in conflict because the specifications allowed the contractor to choose between two types of retainer material, and while the drawings altered the dimensions for the concrete retainers, the drawings did not eliminate the contractor's ability to choose to use polystyrene retainers.

In considering cross-motions for summary judgment filed by both the government and Medlin, and the parties' assertion that the essential facts are undisputed, the Board recognized that "only the legal effect" of the provisions of the specifications and drawing were at issue. While noting that "there is a difference between the language in subpart

---

[1] Medlin originally filed a claim for $58,904.12 and later revised it to the amount listed above after correcting a mathematical error in the computation regarding Medlin's general liability insurance.

2.2 of the specification and the Contract drawing detail regarding the typical grade beam void," the Board determined that the specification and the drawing were not in conflict because the drawings merely narrowed the options available to the contractor from two choices (i.e., polystyrene or concrete retainers), to one choice (i.e., only concrete retainers).

The Board reached that conclusion by relying on its previous decisions in Caddell Construction Co., A.S.B.C.A. No. 32,641, 87-1 BCA ¶ 19,359, and A. R. Mack Construction Co., A.S.B.C.A. No. 49,526, 97-1 BCA ¶ 28,742, in which it held that a specification provision that allows latitude or options is not in conflict with contract drawings that narrow the latitude or options because the specific requirements of the drawings did not contradict or override the specifications, but rather complemented them by providing particularization and additional detail. Although the Board agreed with Medlin that there are factual distinctions between the facts of the present case and the facts of Caddell and A. R. Mack, the Board did not find those distinctions sufficient to distinguish the holdings in those cases. Thus, the Board agreed with the government's interpretation that the contractor was limited by the drawing to only one retainer type, concrete. Accordingly, the Board granted the government's motion for summary judgment and denied Medlin's cross-motion for summary judgment.

Pursuant to 41 U.S.C. § 607(g)(1)(A), Medlin appeals the Board's grant of summary judgment in favor of the government. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(10).

## II.  DISCUSSION

### A.  Standard of Review

The standard of review in cases under the Contract Disputes Act is governed by

41 U.S.C. § 609(b), which provides:

> In the event of an appeal by a contractor or the Government from a decision of any agency board pursuant to section 607 of this title, notwithstanding any contract provision, regulation, or rules of law to the contrary, the decision of the agency board on any question of law shall not be final or conclusive, but the decision on any question of fact shall be final and conclusive and shall not be set aside unless the decision is fraudulent, or arbitrary, or capricious, or so grossly erroneous as to necessarily imply bad faith, or if such decision is not supported by substantial evidence.

41 U.S.C. § 609 (2000).

As to questions of fact, if the Board's factual findings are supported by substantial evidence, we will not alter them unless the decision "is fraudulent, arbitrary, capricious, or so grossly erroneous as to necessarily imply bad faith." Id.; see Fruin-Colnon Corp. v. United States, 912 F.2d 1426, 1428-29 (Fed. Cir. 1990) (citations omitted); United States v. Gen. Elec. Corp., 727 F.2d 1567, 1572 (Fed. Cir. 1984) ("Substantial evidence 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'").

As to questions of law, however, the Board's decision is not final or conclusive, Am. Elec. Labs., Inc. v. United States, 774 F.2d 1110, 1112 (Fed. Cir. 1985), and thus the Board's interpretation of a contract is not binding upon this court, B.D. Click Co. v. United States, 614 F.2d 748, 752 (Ct. Cl. 1980). Although "we give careful consideration and great respect to a board's interpretation because legal interpretations by tribunals having expertise are helpful even if not compelling[,]" Fruin-Colnon, 912

F.2d at 1429 (citations omitted), the interpretation of a contract is reviewed as a matter of law, and thus reviewed de novo, Lockheed Martin IR Imaging Sys. v. West, 108 F.3d 319, 322 (Fed. Cir. 1997).

The general rules of contract interpretation apply to contracts to which the government is a party. Lockheed Martin, 108 F.3d at 322. A reasonable interpretation must "assure that no contract provision is made inconsistent, superfluous, or redundant." Id. (citing McAbee Constr., Inc. v. United States, 97 F.3d 1431, 1435 (Fed. Cir. 1996); Hughes Commc'ns Galaxy, Inc. v. United States, 998 F.2d 953, 958 (Fed. Cir. 1993)).

B.  Contract No. DACA63-02-C-0015

1.

The central issue in this appeal is whether the Contract required Medlin to furnish concrete void retainers or whether the Contract permitted Medlin to choose to furnish either concrete or polystyrene void retainers. As stated above, the parties do not dispute that the Contract specifications gave the contractor the choice between using concrete or polystyrene retainers. The dispute between the parties centers on the legal effect of the drawing detail, which shows only a concrete retainer; thus, we review the Board's interpretation de novo. Id.

Medlin's interpretation of the Contract is that the drawing detail and specifications are not in conflict because the drawing detail generally shows how either type of retainer should be used, and specifically references concrete retainers to indicate a change in the dimensions previously provided in the specifications for those retainers. Medlin also asserts that the drawing did not explicitly exclude the use of polystyrene

retainers. Accordingly, Medlin interprets the Contract as permitting the contractor to choose to use either concrete or polystyrene retainers, but as requiring the contractor to use the dimensions listed for concrete in the drawings if the contractor chooses to use concrete. Medlin argues that its interpretation of the Contract is the only reasonable interpretation because it gives meaning to all parts of the Contract by preserving the contractor's ability to choose to use polystyrene in paragraph 2.2.1 of Section 03100A of the specifications, a choice which under the government's interpretation is rendered meaningless.

The government's interpretation, accepted by the Board, is that the drawing not only changed the dimensions listed in the specifications for the concrete retainers, but also "narrowed" the contractor's ability to choose to use polystyrene retainers by requiring that the contractor use only concrete retainers. The government asserts that Medlin's interpretation is unreasonable because it renders the "TYPICAL GRADE BEAM VOID DETAIL" meaningless by failing to interpret it as requiring the installation of only concrete retainers.

2.

We conclude that Medlin's interpretation, unlike the government's, gives meaning to all of the Contract provisions and is therefore the only reasonable interpretation of the Contract. In other words, there is no inconsistency between the contractual provisions giving the contractor a choice between using polystyrene or concrete retainers and the reference in the drawing to only concrete retainers. Read as a whole, the contract permitted the use of either type of retainer, but if the contractor chose to use concrete, the contractor was required to follow the dimensions for concrete as listed in the

drawing. Thus, the drawing's reference to concrete, did not restrict the contractor's right to use, at its option, polystyrene for the fiber void retainers. The interpretation advanced by the government reads paragraph 2.2.1 of Section 03100A, describing the polystyrene retainers, entirely out of the Contract because it is undisputed that polystyrene retainers were not used or called for in any other portion of the Contract. Because the government's interpretation would render that portion of the Contract meaningless and superfluous, it is not reasonable. Medlin's interpretation, on the other hand, preserves the meaning of each provision of the Contract and is therefore the only reasonable interpretation proposed by the parties.

First, the specifications for both types of retainers refer the contractor to the drawing detail to determine if the size as therein indicated is different than the measurements quoted in the specifications. Paragraph 2.2.1 provides that: "Polystyrene rigid insulation shall conform to ASTM C 578, Type V, VI, or VII, square edged. <u>Size shall be</u> 38 mm thick by 400 mm in height by 1 meter in length, <u>unless otherwise indicated</u>[,]" while paragraph 2.2.2 provides that: "Precast concrete units shall have a compressive strength of no less than 17 MPa, reinforced with 150 mm by 150 mm by W1.4 WWF wire mesh, and 300 mm (height) by 1 m (length) by 40 mm (thickness) <u>in size unless indicated</u>." Fort Hood Contract No. DACA63-02-C-0015, Specification Section 03100A, Paragraph 2.2 (emphases added). It is undisputed that the "unless indicated" language refers to the drawing detail. Thus, the specifications refer the contractor to the drawing detail to determine if the size of the material for the retainers is different than the size quoted in the specifications. See <u>A. D. Roe Co., Inc.</u>, A.S.B.C.A. No. 23,425, 79-1 BCA ¶ 13,575 (holding that "unless otherwise specified"

language in the contract's specifications referred to the drawings and served to modify the specifications' direction to only apply paint, so that the instructions would also include applying a liquid glaze coating on some of the walls in accordance with the drawings).

Second, it is undisputed that the drawing detail did in fact change the size measurements for the concrete retainers to "41 x 304 x 914 mm PRECAST CONC. CONT. RETAINERS[.]" It is therefore not rendered meaningless under Medlin's interpretation.

Third, there is no explicit indication in the drawing detail that polystyrene retainers were unacceptable. In situations where the specification provides information that is not contained in the drawings, or vice versa, FAR 52.236-21(a), as incorporated in the Contract, states that the missing information "shall be of like effect as if shown or mentioned in both." This provision is colloquially known as the "like effect" provision. See Merritt-Chapman & Scott Corp. v. United States, 355 F.2d 622 (Ct. Cl. 1966) (applying the "like effect" provision of the contract to require the placement of material both around the tanks, as described in the specifications, and under the tanks, as shown in the drawings; and finding that the specifications' description of the placement of material was qualified by the phrase "as shown on the plans," which clearly referred to the drawings); Hobbs Constr. & Dev., Inc., A.S.B.C.A. No. 29,910, 91-1 BCA ¶ 23,518 (finding that the contract specifications calling for a storehouse "complete and ready for use" did not conflict with the contract drawings showing that the storehouse was to have smoke and heat relief vents because the contract's "like effect" provision

05-1514                                    11

required that the specifications be interpreted as showing the smoke and heat vents as well).

The "like effect" provision does not apply in only one direction, i.e., reading the drawing details into the specifications; rather, it applies in the other direction as well, reading details from the specifications into the drawings (assuming the specifications and drawings do not conflict). Thus, it is entirely reasonable to read the specifications' description of the polystyrene retainers "as if [the polystyrene retainers were] shown or mentioned in both."

Contrary to the government's position, this interpretation does not render any portion of the Contract meaningless because if the contractor chooses to use concrete retainers, the drawing detail controls the size measurements. If, however, the contractor chooses to use polystyrene retainers, the void detail information provided in the drawing is still relevant to the construction and installation of the polystyrene retainers. The only information in the drawing detail that would not have import, would be the size dimensions of the concrete retainers if the contractor chooses to use polystyrene.

Fourth, we reject the premise of the government's argument that interpreting the Contract to maintain the contractor's ability to choose between two options for performance renders a portion of the drawings, i.e., those pertaining to the option not chosen, meaningless because the contractor may ultimately not choose that option. It is not unreasonable to conclude that the Contract provides two acceptable methods of performance. A necessary result of the Contract, assuming the contractor consistently chooses the same option for performance, is that the other option is never chosen.

Thus, it is not the interpretation that renders such a provision meaningless, but rather the necessary result which follows from the contractor's continued choice to use only one of the methods. Such an interpretation remains reasonable especially when either method of performance is structurally sufficient to accomplish the goals of the Contract.[2]

Fifth, Medlin's interpretation is the only interpretation that truly avoids a conflict between the specifications and the drawing. This is because the government's characterization of its interpretation as merely "narrowing" the choices available to the contractor is incorrect; its interpretation does not "narrow," it completely "eliminates" the contractor's choice to use a polystyrene retainer as provided in the specifications. Although the Board relied on Caddell, A.S.B.C.A. No. 32,641, and A. R. Mack, A.S.B.C.A. No. 49,526, in accepting the government's interpretation, neither case supports the government's interpretation or the Board's finding that the drawings merely "narrowed" the options described in the specifications because each is distinguishable on its facts in a non-superficial way.

In Caddell, A.S.B.C.A. No. 32,641, the contract specifications incorporated a pipe manufacturer's brochure which allowed for either a 3-pipe configuration (which the appellant used) or a 4-pipe configuration (which the government argued should have been used), whereas the drawings specified only the 4-pipe configuration and did not use the 3-pipe configuration. Concluding that the specifications and drawings were not in conflict, the Board noted several key facts of the contract in that case: (1) the brochure required the selection of the pipe configuration that would match the work

---

[2] The government does not dispute Medlin's assertion that there is no indication that polystyrene retainers were not structurally sufficient for the purposes of the Contract.

which was to be attached to it; (2) the drawings were expressly incorporated into the specification in their entirety; and (3) the drawings clearly showed that the work which was to be attached to it required the 4-pipe configuration. Reading the brochure as a whole, it did not actually give the contractor a choice with respect to the pipe configuration because the brochure indicated that the configuration would be limited to that which would match the work that was to be attached to it. Thus, it was incumbent on the contractor to look to the drawings to determine which configuration it was required to supply based on the work which was to be attached to it, and the drawings were clear that the 4-pipe configuration was required for such purpose.

Medlin's Contract specifications, on the other hand, did not indicate that the retainer type was at all limited by other structural requirements of the Contract or other work that was to be performed. Nor were the Contract drawings expressly incorporated into the specifications in their entirety. Thus, unlike Caddell, the Contract specifications do not limit the contractor's ability to choose which type of retainer to use.

In A. R. Mack, A.S.B.C.A. No. 49,526, the contract specifications required the contractor to provide unit heaters with stationary or rotating air deflectors, without specifying any particular number of either type, while the contract drawing required a specific number of each type. There was no "irreconcilable conflict" between the specifications and drawing because the drawings did not completely eliminate the ability of the contractor to use both stationary and rotating air deflectors; rather, the drawings utilized each type of deflector and included how many of each type was required. Thus, although the Board did not explicitly state that it was doing so, it gave the "like effect" to

the drawing details as if they were also shown in the specifications. Therefore, the Board was able to interpret the contract to avoid an irreconcilable conflict.

Unlike the contract in A. R. Mack, the drawing in Medlin's Contract did not merely add details regarding how many polystyrene and concrete retainers Medlin was required to furnish; rather, under the Board's interpretation, the drawing eliminated the polystyrene option because it only showed a concrete retainer. Thus, not only is the contract at issue in A. R. Mack distinguishable from Medlin's Contract, but the interpretation advanced by the government in this case, that the drawings eliminated a portion of the specifications, is unsupported by that decision.

Further, as discussed infra, the government's interpretation of the Contract as accepted by the Board would place the specifications and the drawing in direct conflict because the result would be that the specifications allow two choices without any modifying "unless otherwise indicated" language, whereas the drawing allows only one. Thus, it is clear that only Medlin's interpretation would avoid such a conflict.

3.

Even if we accepted the government's interpretation, we would reach the same result, i.e., that Medlin is entitled to an equitable adjustment because the government's interpretation places the specifications and drawing in an irreconcilable conflict. Such interpretation is in conflict because the specifications provide two acceptable methods of performance (i.e., polystyrene or concrete retainers), yet the drawings provide only one (i.e., concrete retainers). In Franchi Construction Co. v. United States, 609 F.2d 984 (Ct. Cl. 1979), the Court of Claims found that the details of a provision of the specifications conflicted with the details of the drawings and relied on the order of

precedence clause to conclude that the specifications govern. Medlin's Contract similarly has an order of precedence clause, FAR 52.236-21(a), which provides that "[i]n [the] case of [a] difference between drawings and specifications, the specifications shall govern." Applying the clause, dictating that the specifications govern over conflicting drawing details, it is apparent that the contractor's ability to choose polystyrene retainers as delineated in the specifications survives the drawing's sole reference to concrete retainers. In other words, even under the government's interpretation of the Contract, Medlin retained the ability to choose to use polystyrene retainers.

## III. CONCLUSION

Because the government demanded that Medlin use concrete retainers, in violation of the choice provided in the contract, and because Medlin used the costs associated with polystyrene retainers in its bid for the contract, Medlin is entitled to an equitable adjustment in the amount of the extra costs associated with supplying concrete retainers instead of polystyrene retainers. Accordingly, we reverse the Board's summary judgment finding in favor of the government and remand for the Board to enter summary judgment in favor of Medlin and for the Board's determination of quantum.

## COSTS

Each party shall bear its own costs.

## REVERSED and REMANDED